IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

NANCY M. NOVOTNY,

Petitioner,

vs.

ANDREW M. SAUL,[1] Commissioner of the
Social Security Administration;

Respondent.

**8:18-CV-437**

**MEMORANDUM AND ORDER**

Nancy Novotny ("Petitioner") filed her Complaint (Filing 1) seeking judicial review of the Commissioner's denial of her application for disability insurance benefits and moved this Court for an order reversing the Commissioner's final decision. Filing 16. The Commissioner filed his motion to affirm the agency's final decision denying benefits. Filing 20. For the reasons stated below, the Court grants the Commissioner's Motion and denies Petitioner's Motion.

## I. PROCEDURAL HISTORY

In August of 2015, Petitioner applied for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401 et seq. ("Title II") and supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. § 401 et seq. ("Title XVI"). Tr. 11. Petitioner alleged the disability began on May 6, 2014. Tr. 11. On September 16, 2015, Petitioner completed her initial disability report, explaining she was applying for disability benefits due to fibromyalgia, liver issues, depression, arthritis in her neck, cervical spine bulging disc, and left hip problems. Tr.

---

[1] Andrew M. Saul was sworn in as Commissioner of Social Security on June 17, 2019, for a six-year term that expires on January 19, 2025. Pursuant to Fed. R. Civ. P. 25(d), he will be automatically substituted as a party in the place of Nancy A. Berryhill, former acting Commissioner.

316. Both claims were denied initially and on reconsideration. Tr. 11. Following a hearing, the administrative law judge ("ALJ") denied Petitioner's request for disability insurance benefits under Title II after finding that she was not disabled as defined by 42 U.S.C. §§ 216(i) and 223(d) prior to December 22, 2017. Tr. 21-22. However, on December 22, 2017, Petitioner's age category changed. Tr. 21-22. The ALJ granted Petitioner's Title XVI claim related to supplemental security income, finding that Petitioner was disabled beginning on December 22, 2017, the date her age category changed. Tr. 21-22. The Appeals Council of the Social Security Administration later denied Petitioner's request for review of the ALJ's decision. Tr. 1. Accordingly, Petitioner's complaint challenges only the ALJ's Title II denial of disability insurance benefits prior to December 22, 2017. Filing 1.

## II. BACKGROUND[2]

Petitioner was 47 years old when her insured status expired and 50 years old when the ALJ determined she was eligible for supplemental security income benefits. Tr. 293, 295. She had at least a high school education and was able to communicate in English. Tr. 20, 317. Petitioner graduated from high school and had past relevant work experience as a system administrator, system engineer, and data entry worker. Tr. 317.

### A. Medical History

---

[2] This Court's General Order No. 2015-05 instructs that a plaintiff challenging a final decision of the Commissioner of the Social Security Administration shall include in his or her brief supporting a motion to reverse the decision "a statement of material facts," which is "supported by page references to the administrative record." The Commissioner must then file a motion to affirm its decision and include with its supporting brief "a non-repetitive counter-statement," if the Commissioner disagrees with any portion of the plaintiff's statement. Here, the parties have substantially complied, and a synthesis of their competing statements composes this section of the Court's order.

Upon referral from her treating physician, Cheryl MacDonald, M.D., ("Dr. MacDonald"), Petitioner saw Dr. Eric Phillips, M.D., ("Dr. Phillips") a neurosurgeon, at the Nebraska Spine Center for neck, low back, and leg pain on May 12, 2014. Tr. 408. At that appointment, Petitioner informed Dr. Phillips of intermittent neck pain and occasional left leg pain. Tr. 408. She further stated her pain ranged from a five out of ten to a ten out of ten. Tr. 410. Dr. Phillips preliminarily determined Petitioner may have coccydynia, though a CAT scan was needed for further evaluation. Tr. 412. Dr. Phillips provided Petitioner with a seat insert to address her current discomfort. Tr. 412.

In July of 2014, Dr. Phillips ordered and reviewed an MRI of Petitioner's pelvis, noting the results were inadequate for evaluation of coccydynia. Tr. 415, 422. As a result, Dr. Phillips prescribed, and Petitioner began, physical therapy upon belief that Petitioner's symptoms were residual from a prior shoulder surgery and not the result of myelopathy or radiculopathy. Tr. 415. Petitioner started physical therapy on July 23, 2014. Tr. 967.

Petitioner returned to Dr. Phillips in August due to continued coccyx pain, and Dr. Phillips performed an injection which provided "100% relief of typical discomfort." Tr. 420. Shortly thereafter, Petitioner was discharged from physical therapy but restarted on September 30, 2014, after Dr. Shane Raikar, M.D., ("Dr. Raikar") ordered physical therapy. Tr. 915, 965. Around that same time, Dr. Raikar ordered an MRI of Petitioner's lumbar spine to help explain Petitioner's low back and left leg pain, but the MRI was negative. Tr. 964. A month later in October, Dr. Raikar injected Petitioner's lumbar spine to help with the pain but the injection was unsuccessful. Tr. 541, 543. Petitioner began seeing Rita Fowler, PA, ("Ms. Fowler") for pain management at Dr. Raikar's clinic in November. Tr. 541, 543.

Petitioner informed Ms. Fowler that sitting, standing, and riding in a car increased her symptoms but laying down reduced them. Tr. 543. Ms. Fowler noted that Petitioner appeared to be in "mild distress." Tr. 544. Based on Petitioner's statements, Ms. Fowler added Lyrica, continued Diclofenac, and set up a right sciatic nerve block. Tr. 544. Later that month, Petitioner was discharged from physical therapy. Tr. 913.

On November 24, 2014, Petitioner went back to Dr. MacDonald for primary care, and Dr. MacDonald referred Petitioner to another specialist but noted Petitioner was walking with "minimal to no limp." Tr. 665, 667.

During December of 2014, Petitioner went back to Dr. Raikar twice for left sciatic nerve injections and reported pain levels of eight out of ten. Tr. 546, 548. Petitioner then followed up with Ms. Fowler for pain management and reported low back and left leg pain rated at seven out of ten despite the injection providing "40% sustained relief." Tr. 550. In January of 2015, Dr. Raikar performed left intra-articular hip injections that provided no relief, noting minimal distress and tenderness in Petitioner's paraspinal lumbar muscles. Tr. 553, 555, 558.

In February of 2015, Petitioner saw Dr. MacDonald, and Dr. MacDonald noted that Petitioner overall showed no signs of acute distress. Tr. 656-57. A month later, Petitioner visited Ms. Fowler for pain management, reported pain at 9/10, and received lumbar facet joint injections at the left L3-4, L4-5, and L5-S1 levels from Dr. Raikar. Tr. 560-561, 563. Petitioner came back to Dr. Raikar on April 14, 2015 reporting short-lived relief from the injections and a pain level of 8/10. Tr. 567. Dr. Raikar then refilled Petitioner's medications, ordered physical therapy, and performed a lumbar steroid injection at the L5-S1 level. Tr. 569-70. In May 2015, Dr. Raikar performed radiofrequency ablation twice, first of the left L3, L4 median branch nerves and the L5 dorsal ramus and later on the right nerve roots. Tr. 572, 574.

In June of 2015, Petitioner saw Dr. Michael Feely, M.D., ("Dr. Feely") a rheumatologist, who noted Petitioner's fibromyalgia symptoms continued despite medicinal treatment. Tr. 518. However, Dr. Feely observed Petitioner to have normal range of motion in her arms and legs, normal gait, and no joint abnormalities. Tr. 518. Later in June, Petitioner again saw Ms. Fowler for pain management and reported a pain level of eight out of ten with no improvement from the radiofrequency ablation. Tr. 576-77. A month later, Petitioner informed Ms. Fowler that her pain was at a ten out of ten level after stopping anti-inflammatory prescription use due to elevated liver enzyme levels and multiple unexplained falls. Tr. 577.

On August 5, 2015, Petitioner saw Dr. MacDonald because she had been driving more than usual and had lost the ability to use her hands for a "couple [of] minutes" while driving. Tr. 623. Petitioner stated the symptoms occurred previously at night and now occurred for the first time during the day, but Dr. MacDonald noted that the problem "slowly resolved." Tr. 623. Further, Dr. MacDonald observed Petitioner to have a normal range of motion and normal sensation in both wrists along with some pain during grip strength testing. Tr. 625. As a result, Dr. MacDonald scheduled an MRI for Petitioner's neck and brain which, once completed, showed normal levels except for mild spinal stenosis at the C5-6 level. Tr. 531, 625. Later in August, Petitioner revisited Ms. Fowler and Dr. Raikar subsequently performed a cervical epidural steroid injection at the C6-C7 level. Tr. 587.

In September 2015, Petitioner saw Dr. MacDonald for primary care, and Dr. MacDonald noted that Petitioner was not in acute distress, had normal gait, and could stand without difficulty. Tr. 727. Also in September, Petitioner saw Dr. Raikar for a cervical epidural steroid injection at the C7-T1 level. Tr. 589.

On October 8, 2015, Petitioner saw Ms. Fowler for pain management and reported pain in her neck and left hip at a level of nine out of ten. Tr. 764. However, Dr. Raikar observed Petitioner walking into the exam room without limping or wincing. Tr. 764. A few days later, Petitioner saw Dr. Jeremy Gallant, M.D., ("Dr. Gallant") an orthopedist, concerning her chronic left hip pain. Tr. 777. Dr. Gallant ordered aquatherapy. Tr. 779. Later in October, Petitioner's husband completed a report explaining Petitioner's activities and limitations. Tr. 346-48. Petitioner also saw Dr. MacDonald but did not voice any physical complaints. Tr. 749-51. Also in October, state agency physician Steven Higgins, M.D., noted that Petitioner could do sedentary work with some postural limits, did not have any manipulative limits, and could occasionally climb stairs, ladders and ramps, and could stoop, kneel, crouch, and crawl. Tr. 85-86.

On November 5, 2015, Petitioner returned to Ms. Fowler for pain management, reporting numbness in her hands, pain in her neck and left hip, and her failure to start aquatherapy. Tr. 767. On December 3, 2015, Petitioner saw Dr. Feely and reported continued problems with fibromyalgia and chronic pain. Tr. 803. However, Dr. Feely documented normal joints, range of motion, and muscle strength. Tr. 805. That same day, Petitioner saw Ms. Fowler for pain management, reporting pain, numbness, and tingling in both arms. Tr. 837. Ms. Fowler conducted EMG studies which showed results consistent with mild, borderline carpal tunnel syndrome on the right and no evidence of cervical radiculopathy. Tr. 838, 840. On December 7, 2015, Dr. Gallant performed an injection to Petitioner's left hip which, according to Petitioner, did not help with the pain. Tr. 771-74, 1249. Shortly thereafter, Petitioner again began physical therapy to address left hip pain. Tr. 871. In December, Petitioner saw Dr. MacDonald and reported some depression, difficulty sleeping, and hip pain. Tr. 1249. At that visit, Dr. MacDonald monitored Petitioner's

medications, noted Petitioner "overall [has] continued to improve," and told Petitioner to "keep working on pain management" and water therapy. Tr. 1251.

On December 23, 2015, Petitioner saw Dr. Phillips again, this time concerning pain between her shoulder blades and hand numbness. Tr. 822. Dr. Phillips, reviewing an MRI, noted normal spinal alignment and a C5-6 bulge without significant compression. Tr. 824. Although Petitioner said she had pain with almost every posture, Dr. Phillips documented an absence of limb weakness, atrophy, balance problems, numbness, and joint swelling. Tr. 822-23. Dr. Phillips recorded that Petitioner had an excellent and painless range of motion in her neck with minimal disk bulge at C5-6 and a positive Tinel sign at her elbows, suggesting carpal tunnel syndrome. Tr. 823-24. As such, Dr. Phillips recommended that Petitioner 1) use elbow splints, 2) avoid placing her elbows on tables or car rests, and 3) change her neck and arm position while sleeping. Tr. 824.

Also in December 2015, state agency physician Jerry Reed, M.D., ("Dr. Reed") reviewed the evidence to date, including the notes and related documentation from each previously mentioned doctor and specialist, and affirmed Dr. Higgins's earlier assessment that Petitioner could do sedentary work with some postural limits, did not have any manipulative limits, could occasionally climb stairs, ladders and ramps, and could stoop, kneel, crouch, and crawl. Tr. 108-19.

Despite Dr. Reed's conclusion and Dr. MacDonald's note of continued improvement, Petitioner reported increasing hip pain since October 2015 and hand numbness on her Disability Report appeal form shortly thereafter. Tr. 365. Following up on her hand numbness, Petitioner saw Manjula Tella, M.D., ("Dr. Tella") in early January of 2016, and Dr. Tella ordered EMG and nerve conduction studies. Tr. 834, 836. On January 10, 2016, Petitioner saw Dr. Gallant and reported left hip pain and a shingles flare up after her last hip injection. Tr. 1066-68. Dr. Gallant encouraged

her to try aquatherapy. Tr. 1066-68. A month later, Petitioner saw Ms. Fowler for pain management after stopping water therapy "due to increased pain and transportation issues." Tr. 800. Another month passed and Petitioner's physical therapist discharged her from aquatherapy as Petitioner was no longer benefiting from the program and had five cancellations in less than three months. Tr. 868. Petitioner's discharging physical therapist noted that Petitioner rated her pain an eight or nine out of ten but reported that she was "able to ride in vehicles and participate in community activities" and "able to run her day care." Tr. 868.

Throughout the rest of March 2016, Petitioner saw Ms. Fowler for pain management and Dr. Gallant for left hip pain. Tr. 797, 1047. She also saw Dr. Raikar who noted spinal tenderness, normal muscle strength and tone, and normal mood, attention span, and concentration. Tr. 797, 798. On April 8, 2016, Petitioner underwent a left hip MRI that showed Petitioner's left hip was normal, unremarkable, and identified no cause for left hip pain. Tr. 1030, 1031. During a visit in May, Dr. MacDonald noted that Petitioner had a normal gait. Tr. 1190.

In June 2016, Petitioner reported unchanged symptoms and difficulty sleeping. Tr. 789, 1153. In Petitioner's August visit to Dr. Raikar, he noted Petitioner had lost weight and was trying to be more active. Tr. 1284. He also noted she had lumbar tenderness, no radicular symptoms, and no neurological deficits despite Petitioner's reported pain level of eight out of ten. Tr. 1283. Petitioner's September and November appointments with Dr. Raikar produced nearly identical reports and notes. Tr. 1285, 1288-89. In December of 2016, Carmen Magistro, P.A., observed Petitioner to have normal gait and station. Tr. 1306. Petitioner saw Dr. MacDonald for primary care in January of 2017 and a new orthopedist in February. Tr. 1377. The orthopedist ordered a left hip MRI "to see if there is advancing degenerative changes in the hip or if she would benefit

from a repeat arthroscopy." Tr. 1477. A follow-up MRI in March suggested impingement but did not show muscle strain. Tr. 1449.

On April 3, 2017, Petitioner saw Dr. Kimberly Turman, M.D., ("Dr. Turman") for evaluation of her left hip and MRI analysis. Tr. 1333. Dr. Turman reviewed Petitioner's treatment history and her hip, noting that Petitioner displayed no acute distress and had grossly intact strength with minimal discomfort despite claims of continuing pain. Tr. 1333. Dr. Turman also noted that Petitioner's neck was non-tender, and she had full strength in her arms and legs. Tr. 1336, 1337 Dr. Turman recommended an arthroscopy and subsequently performed the surgery. Tr. 1333, 1464. On June 5, 2017, Petitioner returned to Dr. Turman after her left hip arthroscopy and reported some soreness but overall improvement and no more shooting pain. Tr. 1465. Petitioner returned to Dr. Turman in July and reported she was "back to normal activities," "overall doing well." Tr. 1461. Dr. Turman noted that Petitioner was ambulating with regular gait, demonstrating good strength, and "overall doing fairly well." Tr. 1461.

## B. Administrative Hearing

On September 28, 2017, the ALJ held the administrative hearing. Tr. 35. During questioning, Petitioner stood for a few minutes due to left hip pain. Tr. 46. She explained that she had surgery in 2009 and 2017 on her left hip but was no longer in physical therapy or taking medication related to her hip condition. Tr. 46-47. Petitioner noted she experienced "fibro pain" in her tailbone, neck, shoulders, hands, and feet, and had tried physical therapy, aquatherapy, and walking for her pain. Tr. 50. Further, Petitioner explained "any type of steroid" injections designed to help her hip caused her shingles to act up. Tr. 51. Petitioner informed the ALJ that she fell a lot while walking because her left leg sometimes did not respond. Tr. 50.

Petitioner explained she could only sit for a maximum of thirty minutes before needing to stand or lie down for an hour, and she needed to lie down for several hours each day. Tr. 52. Additionally, Petitioner's pain affected her ability to concentrate and sleep, and caused her hands to go numb from time to time. Tr. 61. To manage her pain, Petitioner applied for approval from her insurance to receive spinal cord stimulation treatment. Tr. 56. Her typical day involved taking her daughter to school, alternating between lying down and walking throughout the day, and picking her daughter up from school. Tr. 52-53. Because of her inability to do the activities she used to do, Petitioner experienced symptoms of depression and preferred to "just stay home and do nothing." Tr. 54. Overall, Petitioner stated that her health declined since filing her application. Tr. 59.

The vocational expert then testified and noted that an individual with Petitioner's limitations could perform sedentary unskilled labor including jobs such as document preparer, telephone quotations clerk, and charge account clerk. Tr. 66. The vocational expert explained the jobs would still be available with "an additional break for five minutes per hour in addition to regularly scheduled break." Tr. 67. However, the expert opined that a break of five minutes every half an hour would preclude work. Tr. 67. Lying down for two hours during a work day or missing three days of work a month would also preclude competitive work. Tr. 69.

Also before the ALJ was a letter from Dr. MacDonald submitted September 6, 2017. Tr. 1454-55. In August of 2017, Petitioner's attorney sent Dr. MacDonald a letter posing questions about Petitioner's abilities Tr. 1457-58. In that same letter, Petitioner's attorney also informed Dr. MacDonald that Petitioner had stopped working in 2012 due to pain, slept poorly, had difficulty with her hands, and needed to frequently lie down. Tr. 1457. Further, Petitioner's attorney told Dr. MacDonald that Petitioner felt she could only sit for 30 minutes before shifting position. Tr. 1457.

Petitioner's attorney asked if Petitioner could sit for only thirty minutes before needing to stand or lie down; if she needed to frequently rest, recline, or nap during the day; and if she had been unable to work full time since May 6, 2014. Tr. 1454-55, 1457-58. Dr. MacDonald responded "yes." Tr. 1454-55, 1457-58. Dr. MacDonald stated Petitioner could miss at least three workdays a month because if she exerted herself, she could not be active for one to two days afterward. Tr. 1455.

Dr. MacDonald also generally noted that her clinic saw Petitioner every three to six months, and several specialists had been involved in her care Tr. 1454. Dr. MacDonald stated that after reviewing her records, she thought Petitioner had not been able to work since 2012 and did not expect any changes. Tr. 1454. Specifically, Dr. MacDonald explained:

> In regards to her prognosis, the patient has undergone treatment since 2007 and in review of my records, especially since 2014, she has undergone evaluation and has not been able to work even since 2012 in a productive fashion due to all of these issues. The prognosis of the above-mentioned diagnoses includes long-term issues, pain management, frequent visits, and specialists that will continue to work to keep her pain levels and ability to function at the best level possible. Her treatment continues to be ongoing. Her ability to function in a productive way and work environment has not been present for multiple years. I have documented that she is not to work since 2012 as a result of the above-mentioned issues. I do not expect this situation to improve over time only, and will wax and wane, and continue to be chronic.

Tr. 1454.

## C. The ALJ's Findings

An ALJ is required to follow a five-step sequential analysis to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520(a); *see also Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) ("During the five-step process, the ALJ considers (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents

the claimant from doing any other work.") (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir. 2004)). The ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled" at step three or step five. *See* 20 C.F.R. § 404.1520(a).

Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity. *See* 20 C.F.R. § 404.1520(a)(4)(i), (b). The ALJ found that Petitioner had not engaged in substantial gainful activity since 2001 and therefore was not engaged in substantial gainful activity as of the onset date, May 6, 2014. Tr. 13.

Step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. § 404.1520(c). A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to perform "basic work activities," 20 C.F.R. § 404.1520(a)(4)(ii) & (c), and satisfies the "duration requirement." 20 C.F.R. § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."). Basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1522. If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(ii), (c). The ALJ found that Petitioner had the following severe impairments: fibromyalgia, degenerative disc disease of the cervical and lumbar spines, right carpal tunnel syndrome, obesity, and osteoarthritis of the bilateral hips. Tr. 13.

Step three requires the ALJ to compare the claimant's impairment or impairments to a list of impairments. *See* 20 C.F.R. § 404.1520(a)(4)(iii), (d); *see also* 20 C.F.R. Part 404, Subpart P, App'x 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926). If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be "disabled." 20 C.F.R. § 404.1520(a)(4)(iii), (d). If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five. *See* 20 C.F.R. § 404.1520(a). The ALJ found that Petitioner did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Tr. 14.

Step four requires the ALJ to consider the claimant's residual functional capacity ("RFC") to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work." *See* 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f). "Past relevant work" refers to work performed by the claimant within the last fifteen years or fifteen years prior to the date that disability must be established. *See* 20 C.F.R. § 404.1565(a) and 416.965(a). If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iv), (f).

Here, the ALJ found that Petitioner, on May 6, 2014, had the residual functional capacity to perform the following: lift and carry twenty pounds occasionally and ten pounds frequently; sit six hours in an eight-hour day; and stand and walk two hours in an eight-hour day. Tr. 15. The ALJ found that Petitioner could never "climb ladders, ropes, or scaffolds and only occasionally climb ramps or stairs, balance, kneel, stoop, crawl, and crouch." Tr. 15. Further, Petitioner must avoid "concentrated exposure to vibration, extreme temperatures, and workplaces hazards such as unprotected heights or close proximity to dangerous moving mechanical parts. Tr. 15. Lastly, the ALJ found that Petitioner required five minutes of standing time every hour in addition to normal

breaks. Tr. 15. Ultimately, the ALJ concluded that Petitioner was unable to perform any past relevant work. Tr. 19.

At step five, the ALJ must determine whether the claimant is able to do any other work considering the claimant's RFC, age, education, and work experience. 20 C.F.R. § 404.1520(g). If the claimant is able to do other work, the claimant is not disabled. The ALJ first determined that there are jobs that exist in significant numbers in the national economy that Petitioner could have performed prior to December 22, 2017. Tr. 20. However, the ALJ then determined that after December 22, 2017, there were no jobs that exist in significant numbers in the national economy that Petitioner could have performed as a result of her age category changing. Tr. 21.

## III. DISCUSSION

### A. Standard of Review

The Court reviews a denial of benefits by the Commissioner to determine whether the denial is supported by substantial evidence on the record as a whole. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011) (citing 42 U.S.C. § 405(g)). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." *Id.* (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). The Court must consider evidence that both supports and detracts from the ALJ's decision and will not reverse an administrative decision simply because some evidence may support the opposite conclusion. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). "If, after reviewing the record, the [C]ourt finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision." *Id.* (quoting *Medhaug v. Astrue*, 578 F.3d 805, 813 (8th Cir. 2009)). The Court reviews for substance over form: "an arguable deficiency in opinion-writing technique does not require [the Court] to set aside an

administrative finding when that deficiency had no bearing on the outcome." *Buckner v. Astrue*, 646 F.3d 549, 559 (8th Cir. 2011) (quoting *Robinson v. Sullivan*, 956 F.2d 836, 841 (8th Cir. 1992)). The Court defers to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence. *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011).

If substantial evidence supports the ALJ's decision, the Court should not reverse merely because the Court would have decided differently. *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010). The Court should reverse only when the ALJ's decision falls outside the available "zone of choice." *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006). The Eighth Circuit has held that a court should "defer heavily to the findings and conclusions of the Social Security Administration." *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010).

Additionally, the Court must determine whether the Commissioner's decision "is based on legal error." *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (quoting *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." *Id.* (internal citations omitted) (citing *Brueggemann v. Barnhart*, 348 F.3d 689, 692 (8th Cir. 2003); *Nettles v. Schweiker*, 714 F.3d 833, 836 (8th Cir. 1983)). No deference is owed to the Commissioner's legal conclusions. *Brueggemann*, 348 F.3d at 692 (stating that allegations of legal error are reviewed de novo).

## B. ANALYSIS

### 1. *Weight of treating physician's opinions*

Petitioner argues that the ALJ erred by 1) "reject[ing]" Dr. MacDonald's opinions and 2) failing to provide good reasons for the reduced weight given to Dr. MacDonald's opinions. Filing

17 at 23. The issue before the Court is whether there is substantial evidence, based on the record as a whole, to support the ALJ's decision to afford Dr. MacDonald's opinion little weight.

In evaluating a treating physician's opinion as to the nature and severity of a claimant's impairments, the ALJ must determine whether that opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record"; if the opinion is well-supported and consistent with the other substantial evidence, the ALJ must give it "controlling weight." 20 C.F.R. § 404.1527(c)(2); *see also Nowling v. Colvin*, 813 F.3d 1110, 1122 (8th Cir. 2016). The record must be evaluated as a whole to determine whether the treating physician's opinion should control. *Tilley v. Astrue*, 580 F.3d 675, 679-80 (8th Cir. 2009); *Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005). In doing so, the ALJ must evaluate conflicting medical opinions. *Smith v. Colvin*, 756 F.3d 621, 625-26 (8th Cir. 2014). A treating physician's opinion is entitled to no greater weight than another physician's when it "consists of nothing more than vague, conclusory statements." *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (quoting *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir. 1996)). A treating physician's opinion may be similarly discredited if it is "inconsistent or contrary to the medical evidence as a whole." *Martise v. Astrue*, 641 F.3d 909, 925 (8th Cir. 2011). If a treating physician's opinion is not given controlling weight, the ALJ considers factors such as examining and treating relationship, length of treatment relationship and frequency of examination, nature and extent of the treatment relationship, supportability, consistency with the record as a whole, and specialization to determine the appropriate weight. 20 C.F.R. §§ 404.1527(c)(1-6).

As to Petitioner's first argument of error, the ALJ did not "reject" or "disregard" Dr. MacDonald's opinions but rather determined that her opinions were entitled to "little weight." Tr.

19. As to Petitioner's second argument and as discussed below, the Court has examined the record and finds substantial evidence to support the ALJ's finding that Dr. MacDonald's opinion was not well-supported and consistent with other substantial evidence. *See* 20 C.F.R. § 404.1527(c)(2). Even though there is evidence to support Petitioner's argument, the fact that there is substantial evidence to support the ALJ's finding means this Court must affirm the ALJ's finding. *See Perkins v. Astrue*, 648 F.3d at 897.

In support of her position that Dr. MacDonald's opinion should be given controlling weight, Petitioner points to Dr. MacDonald's longstanding status as Petitioner's primary care physician. Filing 17 at 23. Specifically, she notes that Dr. MacDonald referred Petitioner to specialists and was generally up-to-date with Petitioner's various treatments. Filing 17 at 23. Pointing to these facts alone, Petitioner concludes that Dr. MacDonald's opinions are well-supported, consistent with the substantial evidence in the record, and entitled to controlling weight.

While the ALJ recognized that Dr. MacDonald qualified as a treating physician, he noted that Dr. MacDonald provided "very little actual treatment for [Petitioner's] back, neck, hip, and fibromyalgia. Tr. 19. Further, he noted Dr. MacDonald's infrequent examinations of Petitioner since 2015 and a disconnect between her observations and clinical findings. Tr. 19. "A treating physician's own inconsistency may . . . undermine his opinion and diminish or eliminate the weight given his opinions." *Toland v. Colvin*, 761 F.3d 931, 936 (8th Cir. 2014) (quoting *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006)). Inconsistency may occur when the treating physician's opinion includes limitations not reflected in treatment notes and records. *Id.*

In support of his finding, the ALJ cited to Dr. MacDonald's progress notes. Tr. 19. In her progress notes from November of 2014, Dr. MacDonald wrote that she observed that Petitioner walked with minimal pain and no limp. Tr. 667. In September of 2015, Dr. MacDonald described

Petitioner as having "no acute distress," normal gait, and the ability to stand without difficulty. Tr. 727. At various other visits, noted Petitioner "overall [has] continued to improve," and Petitioner had a normal gait. Tr. 1251. In April of 2017, Dr. MacDonald observed that Petitioner's neck was non-tender, and that she had full strength in her arms and legs. Tr. 1336-37.

Further, the ALJ must evaluate conflicting medical opinions. *Smith v. Colvin*, 756 F.3d 621, 625-26 (8th Cir. 2014). "The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion." 20 C.F.R. §§ 404.1527(c)(3). Conversely, an ALJ may give little weight to a conclusory treating physician's opinion. *Thomas v. Berryhill*, 881 F.3d 672, 675 (8th Cir. 2018). State agency physicians are "highly qualified" and are experts in Social Security disability evaluation. 20 C.F.R. §§ 404.1527(e)(2)(i). The ALJ recognized these principles and cited the reviewing physicians, Dr. Reed and Dr. Higgins, who both opined that Petitioner could do sedentary work with some postural limits. Tr. 19, 85-86, 118-19. Specifically, they noted that Petitioner did not have any manipulative limits and she could occasionally climb stairs, ladders and ramps, and stoop, kneel, crouch, and crawl. Tr. 86, 118-19. The opinions of Dr. Reed and Dr. Higgins both conflicted with the more intense restrictions Dr. MacDonald suggested. *Compare* Tr. 85-86, 118-19, *with* Tr. 1454-55. Dr. MacDonald did not include support for her opinions but rather listed Petitioner's diagnoses and summarily respond with "yes" to Petitioner's questions. Tr. 1454-55.

All of these observations contrast with Dr. MacDonald's assertion that Petitioner was unable to work and could sit for only thirty minutes. Tr. 1454-55. While there is evidence in the record to support Petitioner's argument, there is clearly substantial evidence showing Dr. MacDonald's opinion's inconsistency with the evidence and other physician's opinions. In light

of Dr. MacDonald's opinion being 1) inconsistent with many of her treatment notes, 2) contradictory to the opinions of the reviewing physicians, and 3) conclusory, the Court finds there are substantial reasons and evidence to support the ALJ's decision to give Dr. MacDonald's opinions little weight.

*2. The ALJ's rejection of Petitioner's subjective allegations*

An ALJ may discredit a claimant's subjective complaints where "the evidence as a whole is inconsistent with the claimant's testimony." *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016) (quoting *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006)).

> [T]he ALJ must consider all of the evidence, including objective medical evidence, the claimant's work history, and evidence relating to the factors set forth in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984): (i) the claimant's daily activities; (ii) the duration, frequency, and intensity of the claimant's pain; (iii) precipitating and aggravating factors; (iv) the dosage, effectiveness, and side effects of medication; and (v) the claimant's functional restrictions.

*Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017). If an ALJ conducts his analysis under 20 C.F.R. §§ 404.1529, he need not expressly cite the *Polaski* factors because the regulations mirror those factors. *Vance*, 860 F.3d at 1120. Symptom evaluation is the ALJ's province, and a court will defer as long as good reasons and substantial evidence support the ALJ's evaluation. *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016).

Here, the ALJ conducted his analysis under § 404.1529 and determined that inconsistencies between Petitioner's complaints and the record undermined her persuasiveness. Tr. 16. However, the ALJ did not "disregard"[3] Petitioner's subjective complaints but instead noted that they were

---

[3] While Petitioner cites *Polaski*, 739 F.2d at 1322 and appears to argue that the ALJ "disregarded" Petitioner's subjective complaints (Filing 17 at 23), *Polaski* prevents an ALJ from completely ignoring a claimant's subjective complaints based solely on objective medical evidence not fully supporting such complaints. Petitioner herself posits that the ALJ "found [Petitioner] less credible" as a result of the inconsistencies, rather than completely rejecting her claims. (Filing 17 at 20).

"not fully supported" and weighed them against objective evidence. Tr. 16-17. These determinations were supported by substantial evidence.

The Court agrees with the ALJ's finding that Petitioner's sitting complaints were undermined throughout her medical records by her stated activities and by the contrast between Petitioner's alleged pain levels and her doctors' observations, which included normal gait, good range of motion, and "no acute distress." Tr. 16-19. Specifically, the ALJ considered Petitioner's common claims of pain at a level of nine or ten out of ten but found that, at the time of such claims, examining physicians found no signs of acute distress and largely normal exam results. Tr. 17 (citing Tr. 656-57, 727, 1333). The ALJ further considered that Petitioner "has never reported having to reduce or stop" daily activities due to increased pain. Tr. 17. Additionally, in June of 2017, Petitioner reported she was "back to normal activities" after surgery and was "overall doing well." Tr. 17 (citing Tr. 1461). Dr. Turman even noted that Petitioner was ambulating with regular gate, demonstrating good strength, and "overall doing fairly well." Tr. 1461.

The ALJ also noted that Petitioner 1) did not exhibit difficulty remaining seated at medical appointments despite describing high levels of pain; 2) did not exhibit significant difficulty ambulating or walking without assistance; 3) displayed "mild tenderness in her hip; 4) had no evidence of impairment in her right hip; 5) displayed no muscular atrophy evidencing muscle weakness; and 6) showed no signs of cervical radiculopathy. Tr. 17-18. All of these findings are supported within the record. They constitute good reasons and substantial evidence to support the ALJ's determination that Petitioner's subjective claims were not highly credible and that there is not substantial evidence in the record to support Petitioner's subjective claims.

Petitioner further argues that "the ALJ [played] doctor without sufficient medical opinion support" when reviewing Petitioner's medical records. However, Petitioner cites no case law to

support her position at this point in her brief. Case law is clear that ALJs are permitted to draw "reasonable inferences." *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008) (noting that "our case law permits the ALJ's reasonable inferences" when upholding an ALJ's determination that a claimant's credibility was lessened due to the inconsistency between his subjective claims and objective evidence within the record). Further, the Social Security Administration has provided guidance on this issue, stating:

> When testing a claimant's subjective complaints, the ALJ may consider objective medical evidence; consistency of medical evidence with the claimant's allegations; medical statements; daily activities; the location, duration, frequency, and intensity of symptoms; aggravating or precipitating factors; medication; and treatment.

Social Security Ruling (SSR) 16-3p, 2016 WL 1119029, at *8. ALJs are required to review the record, weigh evidence, resolve conflicts in the evidence, and determine credibility. Here, the ALJ was not "playing doctor" but was instead reviewing medical records and drawing reasonable inferences therefrom.

In summary, the ALJ did not reduce the weight given Petitioner's subjective complaints solely based on a lack of objective medical evidence to support them. Instead, the ALJ found Petitioner less persuasive because her complaints were inconsistent with the record as a whole. The Court finds the ALJ's decision is "supported by good reasons and substantial evidence," and declines Petitioner's invitation to reweigh the evidence in this case. *See Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006); *see also Chaney v. Colvin*, 812 F.3d 672, 677 (8th Cir. 2016) (finding remand is not warranted if the record supports the ALJ's determination).

3. *Substantial evidence*

Petitioner challenges the ALJ's RFC determination, but her argument misses the mark. The RFC is "what the claimant can still do despite his or her physical or mental limitations." *Gann v. Berryhill*, 864 F.3d 947, 951 (8th Cir. 2017) (quoting *Lauer v. Apfel*, 245 F.3d 700, 703 (8th Cir.

2001)). The RFC determination is the responsibility of the ALJ. *Boyd v. Colvin*, 831 F.3d 1015, 1020 (8th Cir. 2016). "The ALJ must determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and [the] claimant's own descriptions of [her] limitations." *Gann*, 864 F.3d at 951 (alterations in original) (quoting *Baldwin v. Barnhart*, 349 F.3d 549, 556 (8th Cir. 2003)). The claimant bears the burden to establish an RFC that indicates disability. *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005).

"Because a claimant's [residual functional capacity] is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Mabry v. Colvin*, 815 F.3d 386, 390 (8th Cir. 2015). While "some medical evidence" must support an ALJ's decision, *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010), an ALJ need not tether the work capacity assessment to any particular medical opinion. *See Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016). Instead, the ALJ may rely upon a constellation of opinions, *see Julin*, 826 F.3d at 1088, or even the medical records themselves. *See Hensley*, 829 F.3d at 932.

Here, the ALJ properly considered Dr. MacDonald's opinion,[4] the opinions of the reviewing physicians, Petitioner's subjective complaints,[5] and the entirety of the record, including extensive consideration of Petitioner's medical records. *See generally* Tr. 15-18. The ALJ largely based his RFC findings on the medical records themselves and the opinions of the two reviewing physicians. Tr. 15-18 (extensively citing Petitioner's medical records and noting the great weight given the opinions of the reviewing physicians). This is in accordance with Eighth Circuit case

---

[4] The ALJ's decision to give Dr. MacDonald's opinion little weight was supported by substantial evidence in the record as discussed previously.

[5] As discussed above, the ALJ found Petitioner less persuasive because her complaints were inconsistent with the record as a whole, and the Court finds the ALJ's decision to do so was properly supported by the record.

law. *See Julin*, 826 F.3d at 1088; *Hensley*, 829 F.3d at 932. Given the ALJ's reliance on Petitioner's *medical* records and the reviewing physicians' *medical* opinions, there is clearly "some medical evidence" supporting his RFC finding. *See Jones*, 619 F.3d at 971.

Petitioner argues that 1) an ALJ's RFC "must ordinarily be supported by a treating or examining source opinion to be supported by substantial evidence; 2) the ALJ should further develop the record if the ALJ believe the professional opinions available are insufficient to determine the claimant's RFC; 3) an ALJ is required to consider at least some supporting medical evidence; 4) the ALJ is not free to "play doctor" when there are no treating or examining source opinions within the record; and 5) the opinions of non-treating physicians alone, when in conflict with the opinion of the treating physician, are insufficient to meet the substantial evidence standard; Filing 17 at 24-25.

Although the Court generally acknowledges the case law cited by Petitioner to be correct statements of law, the Court does not believe such law applies to support a reversal of the ALJ decision in this case.

First, the ALJ's RFC was supported by observations of physicians who treated Petitioner, Petitioner's medical records, and the reviewing physicians' opinions. Tr. 15-18. In *Stormo v. Barnhart*, 377 F.3d 801, 807 (8th Cir. 2004), the claimant raised a similar argument that the ALJ substituted his own opinion without relying on medical opinion support. The *Stormo* Court held that substantial evidence supported the ALJ's RFC determination because the ALJ relied on physicians' notes within the claimant's medical records and reviewing physicians' opinions. *Id.* at 807-08. Here, the ALJ acted similarly.

Second, the ALJ issued a decision in which he determined Petitioner's RFC, so the ALJ must have believed the opinions and medical record before him were sufficient to determine

Petitioner's RFC. "[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." *Swink v. Saul*, 931 F.3d 765, 770 (8th Cir. 2019) (alteration in original) (quoting *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)). As discussed throughout this opinion, the record contains sufficient evidence to support the ALJ's RFC determination.

Third, the record is filled with examples of the ALJ considering medical evidence such as Petitioner's medical records. *See generally* Tr. 15-18.

Fourth, and as discussed previously, the ALJ was drawing reasonable inferences rather than "playing doctor." Further, the ALJ was relying on the reviewing physicians' opinions along with the notes and observations of numerous other medical professionals.

Fifth and lastly, Petitioner is correct that the opinions of the reviewing physicians generally conflicted with those of Dr. MacDonald. However, the reviewing physicians' opinions were not the sole basis for the ALJ's RFC determination. Rather, the ALJ supported his decision to give Dr. MacDonald's opinion little weight and relied on evidence beyond the opinions of the reviewing physicians, specifically Petitioner's voluminous medical records. Tr. 15-18.

In conclusion, the ALJ properly considered the various medical opinions in the record, Petitioner's subjective complaints, and Petitioner's medical records; accordingly, the ALJ's findings, based largely the medical records themselves and the opinions of the two reviewing physicians, are supported by substantial medical evidence within the record as a whole.

4. *Step Three regarding Fibromyalgia*

Petitioner argues the ALJ erred in his Step Three analysis of her fibromyalgia by failing to follow Social Security Ruling 12-2p, 77 Fed. Reg. 43640-01 (2012)[6] and failing to fairly and fully develop the record. Filing 17 at 26-27. At Step Three, the claimant must establish that her impairment meets or equals a listing. *KKC ex rel. Stoner v. Colvin*, 818 F.3d 364, 370 (8th Cir. 2016). To bear the burden of establishing an impairment meets or equals a listing, "a claimant 'must present medical findings equal in severity to all the criteria for the one most similar listed impairment.'" *Stoner*, 818 F.3d at 370 (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)).

The listings in 20 C.F.R. Part 404, Subpart P, Appendix 1, are descriptions of physical and mental impairments defined by several specific signs, symptoms, or test results. Fibromyalgia is not a listed impairment, so the question is whether fibromyalgia "medically equals a listing (for example, listing 14.09D[7] in the listing for inflammatory arthritis), or whether it medically equals a listing in combination with at least one other medically determinable impairment." SSR 12-2p, 77 Fed. Reg. at 43644. When determining and ruling whether the claimant has borne her burden, "an ALJ's failure to address a specific listing or to elaborate on his conclusion that a claimant's impairments do not meet the listings is not reversible error if the record supports the conclusion." *Vance v. Berryhill*, 860 F.3d 1114, 1118 (8th Cir. 2017) (quoting *Karlix v. Barnhart*, 457 F.3d 742, 746 (8th Cir. 2006); *Pepper ex rel. Gardner v. Barnhart*, 342 F.3d 853, 855 (8th Cir. 2003)).

Turning to Petitioner's first argument, SSR 12-2p, by its plain language, does not mandate consideration of § 14.09D whenever an individual with fibromyalgia alleges a disability but rather suggests it as one example for consideration out of many potential listings. *See* SSR 12-2p, 77 Fed Reg. at 43644. *See also Dixon v. Berryhill*, No. 8:18CV343, 2019 WL 3253950, at *3 (D. Neb.

---

[6] Social Security Ruling 12-2p, 77 Fed. Reg. 43640-01 (2012) is a guidance document explaining how the Social Security Administration evaluates fibromyalgia in the disability analysis.
[7] 20 C.F.R. Part 404, Subpart P, Appendix 1 § 14.09D ("§ 14.09D").

July 19, 2019) (citing *Iwan v. Comm'r*, No. 17-CV-97-LRR, 2018 WL 4295202, *4-5 (N.D. Iowa Sept. 10, 2018)) (holding that an ALJ's failure to specifically reference Listing 14.09D in his Step Three fibromyalgia analysis was not required by SSR 12-2P).

Petitioner's second argument is that the ALJ failed to fairly and fully develop the record by obtaining opinions as to equivalent listings. Filing 17 at 26-27. While an ALJ's duty to develop the record is well settled, *Strongson v. Barnhart*, 361 F.3d 1066, 1071 (8th Cir. 2004), the claimant must bear the burden of establishing that her impairment meets or equals a listing by presenting medical findings supporting her position. *See Stoner*, 818 F.3d as 370; 20 C.F.R. §§ 404.1512(a), 416.912(a).

Here, the ALJ did not elaborate on his determination that Petitioner's fibromyalgia, in combination with her other impairments, did not meet a required listing. Tr. 15. However, the ALJ clearly considered Dr. MacDonald's opinions, Petitioner's medical records, the reviewing physician's opinions, and the observations of Petitioner's physicians. *See generally* Tr. 15-19. His lack of discussion of these sources or in Step Three is not grounds for remand when the entirety of his decision and the record as a whole support his conclusion. *Vance*, 860 F.3d at 1118.

While the ALJ wrote that he "reviewed the criteria of the listings that correspond to [Petitioner's] severe impairments," Petitioner points to § 14.09D as a listing for consideration. Tr. 15; Filing 17 at 26. However, Petitioner does not meet the requirements of § 14.09D, and the ALJ's failure to expressly consider it was not reversible error because Petitioner has not shown or argued that her impairments medically equal any listing. For example, § 14.09D requires "manifestations of inflammatory arthritis with at least two constitutional symptoms (severe fatigue, fever, malaise, or involuntary weight loss) and limitations in daily living, socializing, or completing tasks in a timely manner due to deficient concentration, persistence, or pace." The record contains substantial

evidence showing Petitioner's impairments do not meet or equal these requirements: there is little to no evidence Petitioner experienced a fever, involuntary weight loss, or severe fatigue. On that ground alone and without looking further, Petitioner's impairments are not equivalent to § 14.09D. Because an ALJ need not address all specific listings, the ALJ did not err by not recording every listing considered. *See Vance*, 860 F.3d at 1118.

Further, an ALJ need not act as claimant's counsel in developing the record. *See, e.g.*, *Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir. 1994) (holding ALJ does not have obligation to act as claimant's counsel in developing the record); *Banks v. Colvin*, No. 15-CV-01040-CJW, 2017 WL 382239, at *8 (N.D. Iowa Jan. 26, 2017), aff'd sub nom. *Banks v. Berryhill*, 713 F. App'x 528 (8th Cir. 2018). At the end of the hearing, the ALJ asked if Petitioner had anything else to "add or discuss that we have not already talked about" and Petitioner did not discuss or add anything to the record. Tr. 70. This was after the ALJ asked Petitioner's counsel if anything needed to be added to the record at the beginning of the hearing. Tr. 38.

In rebuttal, Petitioner cites *Lott v. Colvin*, 772 F.3d 546, 551-52 (8th Cir. 2014) for the proposition that an ALJ must obtain medical opinions to address equivalence. Filing 17 at 27. In *Lott*, the Court determined that remand was required because the ALJ determined the equivalence of a claimant's mental impairment without an IQ test. *Id.* at 51. Unlike in *Lott*, the record in Petitioner's case is not devoid of insight into Petitioner's fibromyalgia impairment. Numerous physicians, including Drs. Phillips, Raikar, and Feely, addressed and evaluated Petitioner's fibromyalgia pain and management, and two reviewing physicians also set forth their opinions. Tr. 85-86, 118-19. Further, the record is rife with physicians' observations regarding Petitioner's fibromyalgia pain and management. Accordingly, there is substantial and sufficient evidence in

the record to support the ALJ's finding that Petitioner's fibromyalgia does not meet or equal a listing.

Assuming arguendo the ALJ failed to develop the record and obtain additional opinions, Petitioner must show prejudice of unfairness. *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993). Without a showing of prejudice or unfairness, reversal or remand is unwarranted. *Id.* In this case, Petitioner has not asserted or shown prejudice or unfairness as a result of the ALJ's failure to request further opinions as to equivalence. Accordingly, the Court will not remand on this issue upon finding substantial evidence to support the ALJ's determination and finding no prejudice.

*5. Appointments Clause*

Petitioner's Complaint requests this Court vacate the ALJ's decision and remand because "the ALJ that decided Plaintiff's claim was an inferior officer not appointed by a department head or the President." (Filing 1 at 2). However, Petitioner failed to raise this issue in her motion or brief. *See generally* Filing 16, Filing 17. "A party's failure to raise or discuss an issue in [her] brief is to be deemed an abandonment of that issue." *Hacker*, 459 F.3d at 937 n.6 (quoting *Jasperson v. Purolator Courier Corp.*, 765 F.2d 736, 740 (8th Cir. 1985)). Accordingly, Petitioner has abandoned that issue, and the Court need not address it further.

## IV. CONCLUSION

The Court finds the Commissioner's final decision denying Novotny's claim for benefits under the Act should be affirmed.

**IT IS ORDERED:**

1. The Clerk of the Court is directed to substitute Commissioner of Social Security Andrew M. Saul as the defendant;

2. The Commissioner's motion to affirm the Commissioner's final decision (Filing 20) is granted;

3. Petitioner's motion for reversal of the Commissioner's final decision (Filing 16) is denied;

4. The Commissioner's final decision is affirmed;

5. A separate judgment will be entered.

Dated this 8th day of October, 2019.

BY THE COURT:

Brian C. Buescher
United States District Judge